# UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE DIVISION

**In re:**

| | |
|---|---|
| **Louisiana Crane & Construction, LLC** | Case No. 21-50198 |
| | Hearing Date: April 8, 2021 |
| 1045 Hwy. 190 West | at 1:30 P.M. |
| Eunice, Louisiana, 70535 | |
| Tax ID Number: xx –xxx3447 | Chapter 11 |
| **Debtor** | |

### EMERGENCY MOTION FOR (I) INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTOR TO FACTOR AND INCUR POST-PETITION SECURED INDEBTEDNESS, (B) GRANTING SECURITY INTERESTS AND SUPER-PRIORITY CLAIMS, AND (C) AUTHORIZING USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION; AND (II) AN ORDER SCHEDULING A FINAL HEARING

Louisiana Crane & Construction, LLC, a Louisiana limited liability company, and the debtor and debtor-in-possession herein (the "**Debtor**" or "**Louisiana Crane**"), through undersigned counsel, files this *Emergency Motion for (i) Interim and Final Orders (a) Authorizing Debtor to Factor and Incur Post-Petition Secured Indebtedness, (b) Granting Security Interests and Super-priority Claims, and (c) Authorizing the Use of Cash Collateral and Granting Adequate Protection; and (ii) an Order Scheduling a Final Hearing* (the "**Motion**"). In support of the Motion, the Debtor states as follows:

### BACKGROUND

1. The Debtor commenced this case (the "**Chapter 11 Case**") by voluntarily filing a petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") on April 6, 2021 (the "**Petition Date**").

2. The Debtor continues to manage and operate its business as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

4. The statutory relief requested by the Motion are sections 361 and 363 of the Bankruptcy Code, Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the Local Rules of the United States Bankruptcy Court for the Western District of Louisiana, including the Procedures for Complex Cases (the "**Local Rules**").

5. In further support of this Motion, the Debtor relies upon and incorporates by reference the Declaration of Douglas Marcantel in Support of First Day Motions, filed on the Petition Date. In compliance with Local Rules, the Debtor also attaches the Attorney Checklist as **Exhibit 1**.

## RELIEF REQUESTED

6. By this Motion, the Debtor seeks entry of an interim order, substantially in the form of the proposed interim order (the "**Interim Order**") attached as **Exhibit 2**, and, after applicable delays, a final order, each providing, *inter alia,* as follows:

   (a) Authorizes the Debtor to use cash collateral, as such term is defined in section 363 of the Bankruptcy Code (the "**Cash Collateral**"), provided, however, the Debtor would not be authorized to use the proceeds of any account assigned to RTS under either (i) the Amended and Restated Factoring Agreement (the "**Pre-Petition Factoring Agreement**"), dated as of January 10, 2020, by and between the Debtor and RTS Financial Service, Inc. (the "**Factor**" or "**RTS**"), a copy of which is attached as **Exhibit 3**, or (ii) any account assigned to RTS under the proposed new factoring agreement (the "**Post-Petition Factoring Agreement**"), a copy of which is attached as **Exhibit 4**.

   (b) To provide adequate protection to RTS for the Debtor's use of Cash Collateral, to the extent of a diminution of the Pre-Petition Factoring Collateral

(as defined below), *nunc pro tunc* to the Petition Date, grants RTS: (i) first-ranked, priority liens (collectively, the "**Replacement Liens**") on the Debtor's accounts, inventory, equipment, and general intangible, excluding any Avoidance Actions,[1] pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, which Replacement Liens shall be subject and subordinate in priority only to those valid and perfected liens, if any, that existed as of the Petition Date that are superior in rank to valid and perfected liens that secure the Pre-Petition Factoring Obligations; and (ii) a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, with priority over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code with the exception of (x) United States Trustee fees, and (z) professional fees allowed and payable under sections 330, 331 and 503 of the Bankruptcy Code.

(c) For the avoidance of doubt, *nunc pro tunc* to the Petition Date, authorizes RTS to continue to collect monies paid on any account that was assigned to RTS under the Pre-Petition Factoring Agreement before the Petition Date, and authorizes RTS to apply such money to reduce the Debtor's obligations under the Pre-Petition Factoring Agreement (the "**Pre-Petition Factoring Obligations**").

(d) Authorizes the Debtor to enter into, and assign accounts to RTS pursuant to the Post Petition Factoring Agreement.

(e) To secure the obligations under the Post-Petition Factoring Agreement, grants RTS (i) first-ranked, priority liens (collectively, the "**Post-Petition Factoring Liens**") on all of the Debtor's assets other than the Avoidance Actions (collectively, the "**Post-Petition Factoring Liens**"), pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, which liens shall be subject and subordinate in priority only to those valid and perfected prepetition liens, if any, that are superior in rank to valid and perfected liens that secure the Pre-Petition Factoring Obligations, and (ii) superpriority administrative claim status pursuant to section 364(c)(1) of the Bankruptcy Code, with priority over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code with the exception of (x) United States Trustee fees, and (y) professional fees allowed and payable under sections 330, 331 and 503 of the Bankruptcy Code. For the avoidance of doubt, the Post-Petition Factoring Liens shall include a first-ranked, priority lien on all of the Debtor's accounts (as such term is defined in the Uniform Commercial Code).

---

[1] "**Avoidance Actions**" means any and all claims for relief of Debtor or Reorganized Debtor against any and all third parties for the recovery of (a) transfers of Cash, offsets, debt forgiveness and other types or kinds of property, or the value thereof, recoverable exclusively pursuant to sections 502, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, or otherwise applicable non-bankruptcy law, (b) any claims or causes of action of the Archdiocese for subordination under section 510 of the Bankruptcy Code or under other applicable laws, and (c) all claims or causes of action that arise under title 11 of the United States Code under chapter 5 of the Bankruptcy Code.

(f) Schedules a final hearing on the Motion (the "**Final Hearing**") to consider entry of a final order that grants all of the relief requested in the Motion on a final basis and which final order shall be in form and substance (including with respect to any subsequent modifications to the form or substance made in response to objections of other creditors or this Court) acceptable to RTS (the "**Final Order**"); and

(g) Provides for the immediate effectiveness of the Interim Order and waives any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

## THE PRE-PETITION FACTORING AGREEMENT, USE OF CASH COLLATERAL, AND ADEQUATE PROTECTION

**A. The Pre-Petition Factoring Agreement and the Similarities to the Proposed Post-Petition Factoring Agreement.**

7. Before the Petition Date, the Debtor used the factoring services of RTS, pursuant to the Pre-Petition Factoring Agreement[2] by the Debtor, as assignor (in such capacity, the "**Assignor**"), and RTS, as assignee and factor. As noted below, the proposed Post-Petition Factoring Agreement contains provisions that are the same as, or substantially similar to, the Pre-Petition Factoring Agreement.

8. Pursuant to the Pre-Petition Factoring Agreement, RTS, in its sole discretion, decided whether to purchase "Accounts"[3] from the Assignor,[4] and the Assignor agreed to sell,

---

[2] The Pre-Petition Factoring Agreement was preceded by that certain Purchase and Sale Agreement/Security Agreement, dated February 10, 2010, as amended or restated from time to time (the "**Original PSA**"), in favor of Zions Bancorporation, N.A. d/b/a Amegy Bank National Association ("**Amegy**"), as assignee. Thereafter, Amegy assigned the Original PSA and related financing statements to the Factor pursuant to an Assignment and Consent Agreement. Effective as of January 10, 2020, the Factor and the Louisiana Crane amended and restated the Original PSA in the Pre-Petition Factoring Agreement.

[3] An "Account" is defined in the Pre-Petition Factoring Agreement as "any right to payment for goods sold or services rendered by or on behalf of Assignor" and an "Account Debtor" means a person or other entity, which is obligated to pay the Account." Exhibit 3, at Section 1. The same definitions are included in the proposed Post-Petition Factoring Agreement (Exhibit 4).

[4] Although LCC of Alaska, LLC ("**LCC of Alaska**") is named as an additional assignor under the Pre-Petition Factoring Agreement, any Accounts assigned to RTS thereunder have been fully paid, and, therefore, the Pre-Petition Factoring Obligations (as hereinafter defined) do not include any Accounts
{00375484-2} 4

assign, transfer, convey, and deliver to the Factor, those Accounts that the Factor elected to purchase. Upon such sale, the Factor became "the absolute owner of all Accounts purchased" under the express terms of the Pre-Petition Factoring Agreement, and any "remittances received by Assignor for payment of Accounts sold to Factor [became] . . . the property of Factor." Pre-Petition Factoring Agreement, at Section 2.2; Exhibit 3. Moreover, if the Assignor received any payments on the assigned Account, the Assignor agreed to "hold such proceeds in trust for Factor, and shall immediately deliver to Factor, in the identical form, all payments received by Assignor on each such Account, together with all documents accompanying the remittance to Assignor. Assignor guarantees the timely payment of the monies and amounts represented by the assigned Accounts." Pre-Petition Factoring Agreement, at Section 2.2; Exhibit 3.

9. The proposed Post-Petition Factoring Agreement contains the same provision at Section 2.2 (Exhibit 4).

10. The purchase price for each Account purchased by the Factor under the Pre-Petition Factoring Agreement was the net amount of such Account, less the "Factor's fee." The Factor's fee that is payable on sold Account (after such sale, a "**Factored Account**") is calculated as follows: for each day from the date of the advance of a purchase price to Assignor (the "**Advance Date**") until the Factored Account has been paid in full, a daily fee equal to the sum of the one-month prime rate in U.S. dollars ("**Prime**") in effect on the Advance Date, plus 7.5% (the "**Spread**"), divided by 360 (Prime + 7.5%) / 360) is charged on the full net amount of the Account. Pre-Petition Factoring Agreement, at Section 3.1; Exhibit 3. The Factor's fee is

---

assigned to RTS by LCC of Alaska. Further, for the avoidance of doubt, LCC of Alaska is not a party to the proposed Post-Petition Factoring Agreement (Exhibit 4).

{00375484-2}  5

payable by the Factor deducting from a "security reserve";[5] <u>provided, however</u>, the Factor retains the right to require repurchase by the Assignor of any Account as provided in the Pre-Petition Factoring Agreement. "Net amount" means the "gross amount of the Account less any discount or allowance of any nature allowed the Account Debtor." Pre-Petition Factoring Agreement, at Section 3.1; Exhibit 3.

11. The proposed Post-Petition Factoring Agreement retains the Spread of 7.5%, but divides the spread by 365 (Prime + 7.5%) / 365), and adds an "Initial Fee" in the amount of 0.4% of the net amount of each assigned Account, which shall be paid on the date of the initial advance of the purchase price to the Assignor. Post-Petition Factoring Agreement, at Section 3.1, Exhibit 4.

12. Pursuant to the Pre-Petition Factoring Agreement, all Factored Accounts are purchased with full recourse, and if the Assignor breaches any warranty or otherwise violates or defaults on any of the Assignor's obligations thereunder, or if any Factored Account is not paid in full on or before the payment due date of such Factored Account, then upon request by the Factor, the Assignor agreed to immediately repurchase such Account from the Factor for an amount equal to the face amount of such Factored Account (less any payments received by the Factor on such Account from the Account Debtor), together with interest thereon at the rate of zero percent (-0-%) per annum from the date of the assignment of such Account. Pre-Petition Factoring Agreement, at Section 5; Exhibit 3.

13. The proposed Post-Petition Factoring Agreement (at Section 5) contains the same provisions contained in Section 5 of the Pre-Petition Factoring Agreement (Exhibit 4).

---

[5] Under the Pre-Petition Factoring Agreement, the Factor holds twenty percent (20%) of the net purchase price for each Factored Account as a "security reserve." Pre-Petition Factoring Agreement, at Section 3.2; Exhibit 3. The "security reserve" is established in the proposed Post-Petition Factoring Agreement (Exhibit 4), except that the security reserve is calculated after deducting the "Initial Fee" discussed at Paragraph 11 of this Motion.

**B.  The Pre-Petition Factoring Collateral, Including the Cash Collateral, Securing the Pre-Petition Factoring Obligations.**

14. To secure the Pre-Petition Factoring Obligations, the Debtor granted the Factor a security interest in all of the Debtor's accounts, inventory and general intangibles (collectively, the "**Pre-Petition Factoring Collateral**").[6] RTS's security interests in the Pre-Petition Factoring Collateral was perfected by, among other filings, a UCC-1 Financing Statement filed on February 17, 2010, at Louisiana Original File Nos. 09-1128357 and 49-272661 (original secured party being Amegy Bank National Association), continued at Louisiana Original File Nos. 09-1254211 and 49-282913 filed on December 10, 2014, continued again at Louisiana Original File Nos. 09-1408256 and 49-295441 filed on October 2, 2019, and assigned to RTS at Louisiana Original File Nos. 09-1416589 and 49-29657 filed on January 14, 2020 and February 4, 2020, respectively.[7]

15. As of April 5th, the outstanding balance due RTS related to the Factored Accounts was $3,210,192.49.

**C.  Use of Cash Collateral and the Proposed Adequate Protection.**

16. Other than the money it obtains from selling Factored Accounts to RTS, the Debtor's source of operating funds is from the proceeds of the non-factored accounts generated by the operation of the Debtor's business, which constitute Cash Collateral within the meaning of section 363 of the Bankruptcy Code.  The Cash Collateral secures the Pre-Petition Factoring

---

[6] As reflected in the Pre-Petition Factoring Agreement, the Pre-Petition Factoring Obligations are guaranteed by the following:  Logan C. Fournerat; Fournerat & Toups Farms, L.L.C.; LCF Holdings, L.L.C.; and Fournerat Family, L.L.C.  The Post-Petition Factoring Agreement has the same guarantors as the Pre-Petition Factoring Agreement, except that it adds Douglas Marcantel.

[7] Additional UCC-1 Financing Statements are in favor of RTS, as a secured party, including, but not limited to, a financing statement in favor of Tacit 219 Trust, acting as the collateral agent for RTS, as the secured party, which cover various categories of property, including accounts, general intangibles, inventory, and equipment.

Obligations, as previously discussed. The proceeds of the accounts are used by the Debtor to operate, including to pay the Debtor's payroll, insurance, utilities, operating costs, and material acquisitions.

17. The Debtor requires the use of the Cash Collateral to continue the operation of its business and will suffer irreparable and immediate harm if it is not granted the relief requested herein. An immediate and critical need exists for the Debtor to obtain funds in order to continue operations.

18. To provide adequate protection to RTS for the Debtor's use of Cash Collateral, to the extent of a diminution in the value of the Pre-Petition Factoring Collateral, the Debtor seeks authority to grant RTS (a) first-ranked, priority replacement liens on the same collateral constituting the Pre-Petition Factoring Collateral excluding Avoidance Actions, pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, which liens shall be subject and subordinate in priority only to those valid and perfected prepetition liens, if any, that are superior in rank to valid and perfected liens that secure the Pre-Petition Factoring Obligations, and (b) superpriority administrative claim status pursuant to section 364(c)(1) of the Bankruptcy Code.

**D.    Other Creditors who Claim Liens on Cash Collateral.**

19. In addition to RTS, the following parties appear to have liens on the Debtor's Cash Collateral: (a) People's United Equipment Finance Corp. ("**People's**"), which appears to be perfected pursuant to the UCC-1 Financing Statement filed on November 15, 2013, at Louisiana File No. 49-280110, and continued at Louisiana File No. 01-181742, filed on July 27, 2018; and (b) Joseph Earl Toups ("**Toups**") which appears to be perfected pursuant to the UCC-1 Financing Statement filed on November 25, 2013, at Louisiana File No. 01-151563,

and continued at Louisiana File No. 01-181742, filed on July 27, 2018. People's and Toups have consented to the relief sought in this Motion. The Debtor has not received the written consent of Commercial Credit, Inc. who possesses a lien on the Debtor's accounts. Tacit 219 Trust also possesses a lien on the Debtor's accounts, in its capacity as the collateral agent for RTS.[8]

## THE PROPOSED POST-PETITION FACTORING AGREEMENT

20. The Debtor desires to enter into Post-Petition Factoring Agreement with RTS (Exhibit 4). The Post-Petition Factoring Agreement contains the same or substantially similar terms as the Pre-Petition Factoring Agreement, as discussed earlier. Additionally,[9] under the Post-Petition Factoring Agreement, RTS is entitled to recover all of its reasonable out of pocket expenses ("**Factor Expenses**"), including reasonable consultants, attorneys and paralegal fees, costs and expenses, incurred in connection with the Chapter 11 Case. Post-Petition Factoring Agreement, at Section 9.1. The Factor will provide reasonably detailed invoices to the Debtor and any official committee of creditors, so a proper assessment of reasonableness can be made, in accordance with the Local Rules.

21. To secure the obligations under the Post-Petition Factoring Agreement, RTS has demanded both (a) first-ranked, priority liens on all of the Debtor's assets other than the Avoidance Actions, pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, which liens shall be subject and subordinate in priority only to valid and perfected

---

[8] *See supra* note 8.

[9] The Pre-Petition Factoring Agreement contains certain representations and warranties regarding any Account that is assigned thereunder. Section 6.3, Exhibit 3. The Post-Petition Factoring Agreement contains the substantially similar representations and warranties, but adds a representation and warranty that the Account is not subject to any claim, either currently existing, or future claims that the Assignor can reasonably determine are forthcoming due to the filing of bankruptcy or related actions" (see Section 6.3, Exhibit 4), and the consent to jurisdiction provisions have been changed to this Court (see Section 10.2, Exhibits 3 and 4).

prepetition liens, and (b) superpriority administrative claim status pursuant to section 364(c)(1) of the Bankruptcy Code, with priority over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code with the exception of (x) United States Trustee fees, and (y) professional fees allowed and payable under sections 330, 331 and 503 of the Bankruptcy Code.

22. In order to continue its operations, it is necessary for the Debtor to enter into a factoring arrangement with RTS. If the Debtor is not permitted to immediately factor its invoices, the Debtor's cash flow will be disrupted, which will render the Debtor unable to operate in the ordinary course of its business and to timely pay its ongoing operational expenses. Absent prompt entry of the Interim Order, immediate and irreparable harm to the Debtor's estate and its creditors will occur.

23. The Debtor is unable to obtain: (a) unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense; (b) unsecured credit allowable under sections 364(a) or (b) of the Bankruptcy Code; or (c) credit solely with the protection afforded under section 364(c)(1) of the Bankruptcy Code.

24. To the extent its relationship with the Factor is a credit relationship, the Debtor is unable to obtain credit without the Factor being: (a) given priority over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, except United States Trustee fees and professional fees allowed and payable under sections 330, 331 and 503; and (b) granted a first ranked lien on all property of the estate subject and subordinate in priority only to those valid and perfected prepetition liens, if any, that are superior in rank to valid and perfected liens that secure the Pre-Petition Factoring Obligations; and (c) secured by a junior lien on property of the estate that is subject to a lien. Post-petition credit on such terms is authorized by section

364(c)(1), (c)(2) and (c)(3) of the Bankruptcy Code. For the avoidance of doubt, the Post-Petition Factoring Liens shall include, but shall not be limited to, a first-ranked, priority lien on all of the Debtor's accounts (as such term is defined in the Uniform Commercial Code).

## LEGAL ARGUMENT

**A. The Debtor Cannot Obtain Financing on Terms More Favorable than Those in the Post-Petition Factoring Agreement.**

25. Section 364 of the Bankruptcy Code provides that a debtor that is authorized to operate its business may obtain financing either in the ordinary course of business or outside the ordinary course of business. First, Bankruptcy Code section 364(a) allows the debtor to obtain unsecured credit and to incur unsecured debt in the ordinary course of business. 11 U.S.C. § 364(a). Second, after notice and a hearing, the Court may authorize a debtor-in-possession to obtain unsecured credit or incur unsecured debt outside the ordinary course of business allowable as an administration expense under section 503(b)(1) of the Bankruptcy Code.

26. If the debtor-in-possession is unable to obtain unsecured credit on this basis, section 364(c) allows the Court, after notice and a hearing, to authorize the debtor-in-possession to obtain credit or to incur debt that has priority over administrative expenses under section 503(b)(1), priority over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, except United States Trustee fees and professional fees allowed and payable under sections 330, 331 and 503, that is secured by a lien on unencumbered estate property, or that is secured by a junior lien on encumbered estate property. 11 U.S.C. §§ 364(c)(1),(2) and (3).

27. Other than the requirement of notice and a hearing, the only statutory prerequisite under section 364(c) for obtaining credit on a secured basis and superpriority basis

is that the debtor-in-possession must be unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1). 11 U.S.C. § 364(c)(2). The Bankruptcy Code offers a debtor-in-possession additional flexibility to the extent that it needs to borrow additional funds.

28. Section 364 of the Bankruptcy Code provides a progression of various protections to induce a postpetition lender to extend credit to a debtor-in-possession. *In re Sun Runner Marine, Inc.,* 945 F.2d 1089, 1092-93 (9th Cir. 1991). These include administrative priority, super-priority and secured status. 11 U.S.C. § 364. In addition, parties who extend credit are protected under section 364(e) from the effects of a reversal on appeal of the authorization to incur debt as long as they have acted in good faith.

29. To demonstrate that the requisite credit is not obtainable on an unsecured basis, the debtor need only demonstrate "by good faith effort that credit was not available" without the protections afforded to potential lenders by section 364(c). *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.* at 1088; *see also In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) ("Given the 'time is of the essence' nature of this type of financing, we would not require this or any debtor to contact a seemingly infinite number of possible lenders."). Where few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 (N.D. Ga. 1989).

**B. Sound Business Judgement Supports the Debtor's Decision to Enter into the Post-Petition Factoring Agreement.**

30. Courts generally give broad deference to the business decisions of a debtor. *See, e.g., In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Lionel Corporation*, 722 F.2d 1063, 1070 (2d Cir. 1983); *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1987). In particular, a bankruptcy court should defer to a debtor's reasonable business judgment regarding the need for funds, so long as the proposed financing agreement does not contain terms that either leverage the bankruptcy process or that benefit a third party rather than the bankruptcy estate. *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment . . . , [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors"). This was explained by the bankruptcy court in *In re Ames Department Stores, Inc.*, 115 B.R. 34 (Bankr. S.D.N.Y. 1990):

> [A] court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.

*Id.* at 40.

31. Here, the Debtor's decision to enter into the Post-Petition Factoring Agreement represents a reasonable exercise of its business judgment.

**C. The Terms of the Post-Petition Factoring Agreement are Reasonable under the Circumstances and Should Be Approved.**

32. The terms of the Post-Petition Factoring Agreement are similar to those often included in factoring arrangements, including the Pre-Petition Factoring Agreement. Indeed, the Post-Petition Factoring Agreement and the Interim Order reflect the give and take that

result from complex financing negotiations. Courts have recognized that a debtor often must make significant concessions in exchange for financing. *See, e.g., In re Ellingsen MacLean Oil Co.*, 65 B.R. 358, 365 (Bankr. W.D. Mich. 1986), *aff'd,* 834 F.2d 599 (6th Cir. 1987) (chapter 11 postpetition financing is "fraught with dangers for creditors . . ."). Accordingly, courts recognize that a debtor may need to "enter into a hard bargain with a creditor in order to acquire the needed funds to complete reorganization." 65 B.R. at 365.

33. The terms of the Post-Petition Factoring Agreement are fair and reasonable under the circumstances. For example, the Debtor does not propose, among other things, granting the Factor (a) any lien that would outrank valid and perfected liens that exist on the Petition Date, (b) any lien on Avoidance Actions, or (c) the right to any automatic termination of the stay under section 362 of the Bankruptcy Code. See Exhibits 1 and 4.

## FINAL HEARING

34. The Debtor requests that the Court schedule, through the Interim Order, pursuant to Bankruptcy Rule 4001(c)(2), the Final Hearing no later than twenty-one days from entry of the Interim Order.

**WHEREFORE**, the Debtor prays for entry of the proposed Interim Order and granting such other and further relief as the court deems equitable and just.

Dated: April 6, 2021

>Respectfully submitted:
>
>*/s/Douglas S. Draper*
>Douglas S. Draper, La. Bar No. 5073
>ddraper@hellerdraper.com
>Leslie A. Collins, La. Bar No. 14891
>lcollins@hellerdraper.com
>Greta M. Brouphy, La. Bar No. 26216
>gbrouphy@hellerdraper.com
>Heller, Draper & Horn, L.L.C.
>650 Poydras Street, Suite 2500
>New Orleans, LA 70130
>Telephone: (504) 299-3300
>Fax: (504) 299-3399
>**Proposed Counsel for Debtor and Debtor in Possession**

## **Exhibits**

**Exhibit 1**  Attorney Checklist, under Local Rules

**Exhibit 2**  Proposed Interim Order

**Exhibit 3**  Pre-Petition Factoring Agreement

**Exhibit 4**  Post-Petition Factoring Agreement

{00375484-2}  16