UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

In re:

Louisiana Crane & Construction, LLC     Case No. 21-

1045 Hwy. 190 West                      Chapter 11
Eunice, Louisiana, 70535
Tax ID Number: xx –xxx3447

Debtor

# DECLARATION OF DOUGLAS D. MARCANTEL
## IN SUPPORT OF FIRST DAY MOTIONS

The undersigned, Douglas D. Marcantel, hereby declares and states that:

1. I am the Chief Financial Officer of the Debtor, Louisiana Crane & Construction, LLC, a Louisiana limited liability company, which is a debtor and debtor in possession in this proceeding. I am generally familiar with the Debtor's day-to-day operations, business affairs and books and records.

2. On April 6, 2021 (the "Petition Date"), the Debtor commenced a case under chapter 11 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*, as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the Western District of Louisiana.

3. In order to enable the Debtor to minimize the adverse effects of the commencement of its chapter 11 case on its business, the Debtor has requested various types of relief as sought in the First Day Motions (as defined herein). All of the First Day Motions are crucial to the Debtor's reorganization efforts.

{00375382-5}

4. I submit this affidavit in support of the First Day Motions. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion. All facts set forth in this affidavit are based on my personal knowledge, upon information supplied to me by others at the Debtor, upon my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Debtor's operations, financial condition and its present status. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this affidavit.

5. Prior to filing, the Debtor negotiated with a number of capital sources and its secured lenders in the hope of avoiding this filing. The Debtor believes that in short order it will be able to propose a plan that will offer to its secured creditors a cash out option based upon the replacement value of such secured creditors' collateral or a term payout based upon the replacement value of the secured creditors' collateral. The exit financing has yet to be reduced to final commitment, however, term sheets have been drafted and discussed by the parties.

6. The Debtor will also shortly be filing a procedure for the determination and payment of adequate protection payments to its secured creditors who possess a lien on its cranes and other equipment. The procedure motion will hopefully avoid needless litigation and provide a workable format and method so that adequate protection payments can commence quickly to secured creditors.

## Company Background

7. The Debtor was formed in 2002, originally named Louisiana Crane Company, LLC,[1] and owned 70% by Ron Williams and 30% by Logan Fournerat. In 2004, Fournerat & Toups, L.L.C. purchased Williams' 70% interest in the Debtor. From that point on, Mr.

---

[1] The Debtor officially changed its name to Louisiana Crane & Construction, LLC in 2012.

Fournerat has been the Managing Member of the Debtor. Currently, the company is owned 30% by LCF Holding, LLC and 70% by Fournerat & Toups Farms, LLC.

8. The Debtor's operations are divided into three divisions: (1) maintained and operated cranes; (2) construction/maintenance work; and (3) millwright services. In 2013, the Debtor reached peak business, bringing in $258,000,000 in revenue and employing over 2,000 employees. At its peak, the majority of the Debtor's work was in the construction/maintenance work division, primarily in the Eagleford Shale play in Texas.

9. From 2005 through 2011, the Debtor's crane division performed work in Dallas, Houston, San Antonio, and Corpus Christi, Texas, as well as throughout South Louisiana. In 2011, the Debtor sold its Texas crane operations to TNT Crane and Rigging and agreed to not compete in Texas until 2014, at which point, the Debtor moved back into Texas with a focus on oilfield work as opposed to metro work.

10. The Debtor's construction/maintenance division began in 2005 and prompted the hiring of an oilfield division manager. The construction/maintenance division initially focused primarily in the Haynesville Shale in north Louisiana but moved into the Eagleford shale in Texas in 2009.

11. Also in 2005, the Debtor began its Millwright divisions, which does work primarily for BP on the North Slope in Alaska, but also includes work throughout the continental United States.

12. In 2016, the Debtor ran into financial trouble and on July 14, 2016, filed for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Louisiana (the "Bankruptcy Court") [Case No. 16-50876] (the "First Bankruptcy").

13. On August 17, 2017, the Bankruptcy Court confirmed the Debtor's plan of reorganization [Case No. 16-50876, Dkt. No. 651] and on September 26, 2018, the Debtor's First Bankruptcy was closed [Case No. 16-50876, Dkt. No. 703].

14. Following the closure of the First Bankruptcy, the Debtor encountered several unforeseen events, including the following:

   a) An unanticipated change in the fees owed to the United States Trustee;

   b) A 2017 downturn in the oil and gas industry, leading to a reduction in capital expenditures by the Debtor's customers, thereby leading to a reduction in the Debtor's revenue stream; and

   c) An additional downturn in the oil and gas market due to the global health pandemic caused by COVID-19 and the associated shutdown of numerous oil and gas wells throughout the United States.

15. The difficulties created by the above-mentioned occurrences were exacerbated by the fact that all creditors in the First Bankruptcy were treated as fully secured under the terms of the August 2017 confirmed plan of reorganization. This confluence of events created a scenario wherein the costs to the Debtor following the First Bankruptcy exceeded its available resources and has ultimately led to this current bankruptcy filing.

## First Day Motions

16. Shortly after initiating the chapter 11 case, the Debtor filed the following First Day Motions:

   a) *Ex Parte Motion to Extend Deadline to File Bankruptcy Schedules and Statement of Financial Affairs*;

   b) *Emergency Motion for (I) Interim and Final Orders (A) Authorizing the Debtor to Factor and Incur Post-Petition Secured Indebtedness, (B) Granting Security Interests and Super-Priority Claims, and (C) Authorizing Use of Cash Collateral*

      *and Granting Adequate Protection; and (II) An Order Scheduling a Final Hearing;*

   c)    *Motion for Authority to Pay Employees' Pre-Petition Wages, Related Expenses, Benefits and Taxes;*

   d)    *Motion for Entry of an Order Under 11 U.S.C. §§ 105, 363, 364, 1107 and 1108 Authorizing Maintenance of Existing Bank Accounts, Continued Use of Existing Business Forms, Continued Use of Existing Cash Management System Up To October 1, 2021, and for Related Relief;*

   e)    *Motion for Entry of an Order Under 11 U.S.C. §§ 105(a) and 363(c) Authorizing the Debtor to Pay Insurance Premium Financing Payments and Related Relief;*

   f)    *Motion for Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtor on Account of Prepetition Amounts Due; and (B) Establishing Procedures for Determining Requests for Adequate Assurance;* and

   g)    *Notice of Designation as Complex Chapter 11 Case.*

(collectively referred to as the "First Day Motions").

17.    I have reviewed each of the First Day Motions (including the exhibits and other documents attached thereto or submitted therewith) and the allegations contained in each of the Motions are true and correct and the relief sought in each of the First Day Motions is necessary to enable the Debtor to operate in chapter 11 with a minimum of disruption and loss of revenue and constitutes a critical element in achieving a successful reorganization of the Debtor.

18.    ***Ex Parte Motion to Extend Deadline to File Bankruptcy Schedules and Statement of Financial Affairs.*** Due to the Debtor's operations and limited manpower, the Debtor anticipates it will be unable to complete its Schedules and Statements of Financial Affairs in the time required under Bankruptcy Rule 1007(c) without an extension. The Debtor is requesting this short extension, with the Court's authorization under Rule 1007(c), to provide a complete and accurate picture of its financial status and accounts to all interested parties prior to the meeting of creditors under section 341 of the Bankruptcy Code. The Debtor believes that an

additional twenty-five (25) days to complete its Schedules and Statement of Financial Affairs will not impair the setting of the 341 Meeting and provide the U.S. Trustee sufficient time to review the submitted material so that it can conduct the 341 meeting.

19. ***Emergency Motion For (I) Interim and Final Orders (A) Authorizing the Debtor to Factor and Incur Post-Petition Secured Indebtedness, (B) Granting Security Interest and SuperPriority Claims, and (C) Authorizing Use of Cash Collateral and Granting Adequate Protection; and (II) An Order Scheduling a Final Hearing.*** The Debtor has an immediate need to use Cash Collateral for the purpose of meeting necessary expenses incurred in the ordinary course of its business, paying operating expenses, including payroll, and the costs associated with its restructuring and this proceeding, while it restructures and reorganizes its indebtedness and business in a manner that maximizes value and is fair and equitable to all parties in interest. Further, the expenditure of Cash Collateral is necessary in order to preserve the value of the Collateral.

20. Ceasing operations is not in the best interests of any party to this Chapter 11 Case, including the Factor, as the Debtor's failure to operate will immediately and irreparably impair: (a) the Debtor's extrinsic value; and (b) the Debtor's ability to use Cash Collateral to generate cash proceeds in excess of the amount of the Petition Date Cash Collateral.

21. The Debtor was a party to a Pre-Petition Factoring Agreement with RTS Financial Service, Inc. ("RTS") wherein RTS purchased certain accounts from the Debtor for the amount of the account less a Factor's Fee (as defined in the Pre-Petition Factoring Agreement). The RTS relationship replaced the Debtor's prior relationship with Amegy Bank. The selection of RTS was made after careful deliberation by the Debtor after evaluating a number of offers. The RTS pricing is fair in the marketplace and the relationship between the Debtor and RTS has been

beneficial. RTS has been responsive to the Debtor's needs and has worked with the Debtor when issues have arisen such as the amounts due the Debtor by Chesapeake Oil, a recent Chapter 11 debtor. The Debtor's Pre-Petition Factoring Obligations were secured by a security interest in all of the Debtor's accounts, inventory, general intangibles, and equipment, which security interest was perfected by a UCC-1 Financing Statement. RTS's security included a security interest in the Debtor's Cash Collateral. Without use of Cash Collateral on a limited basis as described herein, I believe the Debtor will not be able to pay its employees and other direct operating expenses. Inability to use Cash Collateral on the basis set forth in the Budget would likely result in an immediate cessation of the ongoing operation of the Debtor's business and would cause irreparable harm to the Debtor's estate. Put simply, I believe the Debtor cannot continue operation and cannot even commence its restructuring efforts absent use of Cash Collateral.

22. As adequate protection, the Debtor proposes to grant RTS first-ranked, priority replacement liens on the same collateral Pre-Petition Factoring Collateral excluding Avoidance Actions, which liens shall be subject and subordinate in priority only to valid and perfected prepetition liens to secure any post-petition diminution in value of cash which may constitute Cash Collateral thereof to the extent such interests are entitled to adequate protection against such diminution under the Bankruptcy Code. The Debtor also proposes to grant RTS superpriority administrative claim status.

23. *Motion for Authority to Pay Employees' Pre-Petition Wages, Related Expenses, Benefits and Taxes*. The Debtor seeks an order for authority to pay its employees their prepetition wages, benefits and related taxes. It is absolutely crucial that the Debtor pay its employees their prepetition wages and benefits and the associated taxes in order to keep the

employees and maintain morale amongst the employees. It is believed that many of the employees might quit and find other jobs if they are not paid their prepetition wages. The continued operations and successful reorganization of the Debtor are dependent upon its employees.

24. ***Motion for Entry of an Order Under 11 U.S.C. §§ 105, 363, 364, 1107 and 1108 Authorizing Maintenance of Existing Bank Accounts, Continued Use of Existing Business Forms, Continued Use of Existing Cash Management System Up To October 1, 2021 and for Related Relief.*** Pursuant to the above-titled motion, the Debtor seeks a waiver of the UST's requirement that the Bank Accounts be closed immediately. If the Debtor is required to close the Bank Accounts immediately, this requirement would cause undue disruption to the Debtor's cash flow and business operations. The Debtor requires the time necessary to clear all prepetition checks, drafts, wires and automated clearing house transfers. If the Debtor is not allowed to keep the Bank Accounts open for these purposes, its operations will not only be severely impaired, but critical funds may not be collected on account of certain accounts receivable.

25. To minimize expense to its estate, the Debtor also requests authority to continue to use all correspondence and business forms (including, but not limited to, letterhead, purchase orders, invoices, etc.), as well as checks and bookkeeping records existing immediately before the Petition Date, without reference to its status as a debtor in possession.

26. Changing correspondence and business forms would be unnecessarily burdensome to the estate, as well as expensive and disruptive to the Debtor's business operations. These additional costs will reduce the resources available in the Debtor's estate to satisfy the claims of creditors and other parties in interest. Similarly, opening a new set of books and records as of the Petition Date would create unnecessary administrative burdens and

{00375382-5}  8

21-50198 - #13  File 04/06/21  Enter 04/06/21 20:17:05  Main Document  Pg 8 of 12

expense. For these reasons, the Debtor requests authority to continue to use its existing records as well as its checks and business forms without placing the label "Debtor in Possession" on such checks or forms.

27. ***Motion for Entry of an Order Under 11 U.S.C. §§ 105(a) and 363(c) Authorizing the Debtor to Pay Insurance Premium Financing Payments and Related Relief.*** On March 11, 2021, the Debtor entered into the Premium Finance Agreement (commercial) (the "Agreement") with First Insurance Funding, a Wintrust Company, to finance premiums on several of the Debtor's Insurance Policies. The Premium Finance Agreement provides for financing the total amount of premiums, taxes and fees in the amount of $2,077,778.82. The Debtor provided a down payment of $592,850.23, leaving an unpaid balance of $1,484,928.59 subject to a finance charge based on an annual percentage rate of 6.750% which is $42,130.05. The Premium Finance Agreement provides that the Debtor will make eight (8) installment payments in the amount of $190,882.23 with the first installment due on April 15, 2021, with all subsequent payments due on the 15th of each month thereafter. It is essential to the Debtor's continued operation and reorganization efforts that the Debtor maintains the Insurance Policies on an ongoing and uninterrupted basis. The Insurance Policies provide a comprehensive range of coverage for the Debtor and the estate. Allowing the Insurance Policies to lapse would expose the Debtor to substantial liability for any damages resulting to persons or property of the Debtor and others, and the Debtor would have to bear the costs and expenses of defense litigation. Moreover, the United States Trustee for the Western District of Louisiana requires maintenance of the Insurance Policies in connection with the Chapter 11 Case.

28. These Financed Policies are essential to the preservation of the Debtor's business, property and assets. By continuing to pay the PFA the Debtor is able to increase its liquidity by

deferring the cost of its insurance during the course of this bankruptcy case. This strategy allows the Debtor to turn what would otherwise be a prepaid asset into valuable working capital, increasing the Debtor's financial flexibility.

29. ***Motion for Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtor on Account of Prepetition Amounts Due; and (B) Establishing Procedures for Determining Requests for Adequate Assurance.*** This motion seeks entry of an order prohibiting its prepetition providers of utility services (collectively, the "Utility Companies") from altering, refusing, or discontinuing services on account of prepetition amounts due, pending entry of a final order granting the relief requested herein ("Final Order"), (b) establishing procedures for determining requests for adequate assurance of future performance.

30. The Debtor currently uses electric, natural gas, heat, water, sewer, phone and other similar services provided by multiple Utility Companies, including the Utility Companies identified in the exhibit to this motion.

31. Uninterrupted utility service is essential to the Debtor's ongoing operations and, therefore, to the success of the Debtor's reorganization. The Debtor could not operate its business in the absence of continuous utility service. Should any Utility Company refuse or discontinue service, even for a brief period of time, the Debtor may be forced to cease its operation, resulting in a substantial disruption of its business and loss of revenue. The temporary or permanent discontinuation of utility services would irreparably harm the Debtor's business and jeopardize the Debtor's reorganization efforts.

32. The Debtor intends to pay postpetition obligations to the Utility Companies timely. The Debtor will make these payments from its cash reserves as of the Petition Date and cash generated through its continued operations.

33. The Debtor has historically paid its Utility Companies on a regular and timely basis. As of the Petition Date, the Debtor believes it is current with all Utility Companies, except to the extent that (i) the Debtor has not yet been billed for prepetition utility services, (ii) the Debtor had been billed but payment for such services was not yet due, or (iii) checks have been written but have not yet cleared the Debtor's bank accounts.

34. ***Notice of Designation as Complex Chapter 11 Case.*** The Debtor is seeking to have this case designated as a complex chapter 11 case under the local rules for this Court. It is my understanding that this case meets the local requirements in that the size of the total debt is more than $10 million, there are a large number of parties in interest in addition to other issues complicating the administration of this case and requiring special scheduling procedures.

### Going Forward

35. The Debtor intends to file additional Motions within the next few days that will require the setting of a hearing date or dates. The Motions are the following:

   a) Application to Employ Heller, Draper & Horn, L.L.C.;

   b) Motion to Pay the Pre-Petition Claims of Critical Vendors;

   c) Motion Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals;

   d) Motion to Extend the Time to Assume or Reject Unexpired Leases; and

   e) Motion to Approve Payment to Insiders.

{00375382-5}                                        11

21-50198 - #13  File 04/06/21  Enter 04/06/21 20:17:05  Main Document  Pg 11 of 12

36. In addition to the above Motions, the Debtor will be filing a motion for the Court to implement a procedure to determine the adequate protection payments due some of the Debtor's secured creditors. That motion will allow the Court and the Debtor to deal with "adequate protection issues" in an organized fashion rather than having ten to fifteen separate motions filed by the Debtor's secured creditors. The Debtor will circulate a draft of that motion to counsel and hopefully it can be submitted with the consent of all parties.

## Conclusion

Louisiana Crane & Construction, LLC's ability to reorganize successfully is best served by its continued operation as a going-concern. In order to minimize any loss of value to its business, Louisiana Crane & Construction, LLC's immediate objective is to engage in business as usual following the commencement of this chapter 11 case, with as little interruption to its operation as possible. I believe that if this Court grants the relief requested in each First Day Motion, the prospect for achieving these objectives, to the maximum benefit of creditors and Louisiana Crane & Construction, LLC s estate, will be substantially enhanced.

This 6th day of April, 2021.

_____
Douglas D. Marcantel

{00375382-5}                                                                12

21-50198 - #13  File 04/06/21  Enter 04/06/21 20:17:05  Main Document  Pg 12 of 12